United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAHER CONRAD SUAREZ, | No. C 08-04937 CW (PR) |
|     Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
|   v. | |
| TOMMY FELKER, Warden, | |
|     Respondent. / | |

Petitioner Maher Conrad Suarez is a prisoner of the State of California, incarcerated at High Desert State Prison. On October 28, 2008, Petitioner filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his 2005 state convictions. Respondent filed an answer and Petitioner filed a traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition for writ of habeas corpus.

BACKGROUND

I.  Procedural History

On April 2, 2004, a Humboldt County Superior Court jury convicted Petitioner of first degree murder, attempted murder, two counts of assault with a firearm, and discharge of a firearm from a motor vehicle. (Resp. Memo. P & A at 1.) The jury found Petitioner not guilty of discharging a firearm at an inhabited house but guilty of the lesser included offense of grossly

1  negligent discharge of a firearm. (Id.) The jury found as a
2  special circumstance that the murder was intentional and was
3  committed by discharging a firearm from a motor vehicle at another
4  person outside the vehicle with the intent to kill. (Id.) The
5  jury also found true a variety of firearm-use allegations. (Id.)
6  On May 31, 2005, the trial court sentenced Petitioner to life
7  without the possibility of parole, and a determinate sentence of
8  thirty-six years and four months. (Id.)

Petitioner timely appealed to the California Court of Appeal. On December 29, 2006, the California Court of Appeal filed a written opinion rejecting Petitioner's claims. (Resp. Ex. E at 2-8.) Petitioner proceeded to the California Supreme Court, which denied his petition in a one sentence order on February 7, 2007. (Resp. Ex. G.) Petitioner also filed an original petition for writ of habeas corpus in the California Supreme Court, which was denied on September 17, 2008. (Resp. Ex. I.) Petitioner filed the instant petition on October 28, 2008.

II. Statement of Facts

A. Prosecution Case

1. Death of Justin Anderson

Eureka Police Officer Cindy Manos was dispatched at 9:11 p.m. on June 16, 2003, to California and Del Norte Streets following reports of shots fired. Dispatch reported that a tan vehicle was involved and was last seen heading eastbound on Del Norte. While driving toward the scene, a tan Cadillac passed Officer Manos at a high rate of speed. Manos saw two men in the front of the Cadillac.

When Manos arrived at the scene, she found Justin Anderson lying on his back in the backyard of 1837 California. Manos saw a hole and blood on Anderson's T-shirt in his right upper chest area. Anderson was not conscious, but drew a deep, shuddering breath. An ambulance transported Anderson to the hospital. He arrived at the hospital at 9:32 p.m. with a

United States District Court
For the Northern District of California

gunshot wound to the right side of his chest, no spontaneous respirations, and no heartbeat. He was pronounced dead at 9:45 p.m. from a gunshot wound to his chest.

### 2. Andrew Calderon Testimony

Andrew Calderon, who was 16 years old at the time of the shooting, had pleaded guilty to Justin Anderson's murder, admitted his gang involvement, and was living at a juvenile hall facility. In exchange for his testimony, he was to be sentenced to the California Youth Authority until he turned 25, rather than to a 25-year-to-life sentence in adult prison.

On the evening of June 16, 2003, Calderon left home with defendant in defendant's Cadillac. Although defendant had never told Calderon directly that he was a member of the Norteño gang, Calderon believed he was. Calderon was "associated" with the Norteños, but had not been "jumped into" the gang. Members of the Sureño gang, the Norteños' rival gang, were known by Calderon to live near the intersection of California and Del Norte.

Calderon sat in the front passenger seat of defendant's Cadillac as they headed south on California toward Del Norte. They saw 15 to 20 people on Del Norte. Calderon recognized three or four people in the group that he associated with the Sureño gang, including Justin Anderson. As they passed Del Norte, Calderon made a gang hand sign to antagonize the rival gang members. One block past Del Norte, defendant turned left off of California and stopped his car with the engine still running. He got his gun from under the back seat. With his gun on his lap, defendant drove around the block and stopped his car at the intersection of A Street and Del Norte.

Calderon got out of the car and stood next to the passenger's door across from the crowd. He raised his arms and yelled, "Norte," "14," and "bring it on [,] scraps" (a derogatory term for a Sureño gang member), to antagonize the members of the crowd and get them to walk toward defendant's car. Anderson and a few others approached defendant's car and got within 20 to 30 feet. Calderon thought that one of the men had a gun. Another person had something that looked like a bat and someone else had a knife.

Calderon heard six gunshots. He first thought the Sureños were firing, but did not see any of them doing so. When he got back into defendant's car, defendant was emptying his .38-caliber revolver and fumbling to reload it. Defendant and Calderon drove north on A Street, made a left onto Wabash Street, and parked. Defendant reloaded his gun with six more bullets. Calderon assumed they were going to return to the scene so defendant could shoot again.

3

Defendant drove west on Wabash and turned left onto California heading south, toward the intersection of California and Del Norte. They saw a couple of people near the intersection, but nobody associated with the Sureños. Defendant retraced the same route around the block that he had just followed, and made a third pass through the intersection of California and Del Norte. This time, a crowd had gathered again. Calderon saw about 10 Sureño gang members. Defendant slowed his car but did not stop. Four or five Sureños, including Justin Anderson, moved slowly toward the car, approaching within 20 feet. Anderson was holding some kind of bar. Another man pointed a gun toward defendant's car, but did not fire it.

When defendant's car was in the intersection, he started shooting again, and continued firing until he had driven past the intersection. His left hand was on the steering wheel, his right arm was under his left, and the gun in his right hand was halfway out the car's window. Defendant fired six shots.

Defendant and Calderon drove away, and eventually went to Steve Oliveras's house. On the way, "somethin' was said that we had to get rid of the car, get rid of the gun." A police car passed them heading north on California. Defendant left his car behind a church that was next door to Oliveras's house, and defendant and Calderon went into Oliveras's house. They left in Oliveras's car a few minutes later.

Approximately two hours after the shooting, Eureka Police Officer Curtis Honeycutt found defendant's 1984, white Cadillac parked behind a church. Later, Eureka Police Officer Bryan Franco found six .38-caliber ammunition cartridges in a plastic bag concealed under the car's rear seat cushion. Documents found in the car in defendant's name included a checkbook, proof of insurance, a Sears employee card, a citation issued by the California Highway Patrol, and a diploma from a community school.

### 3. Bowman and Whitehead Testimony

Derek Bowman, age 23, testified under a grant of use immunity. James Whitehead, age 23, also testified. On June 16, 2003, Bowman and Whitehead, in Bowman's Pontiac, followed defendant and Calderon, in defendant's Cadillac, onto California. Defendant stopped his car near California and Del Norte, and Bowman stopped his car behind it.

According to Whitehead, people came toward the cars screaming "and shots popped off." Whitehead did not see anyone in the crowd with a weapon, but he did see defendant firing his gun out the Cadillac's window. Bowman heard a "bunch of shooting" and saw a gun coming out of the driver's side window of defendant's Cadillac. He assumed it was defendant shooting. Whitehead yelled for Bowman to "[g]et me the hell outta here."

4

Defendant's and Bowman's cars drove away and stopped on a nearby street. A few minutes later, Bowman again followed defendant's car back to California and Del Norte. Whitehead and Bowman saw people come toward the cars. Defendant stopped his car and Bowman slowed his. Whitehead and Bowman heard shots and saw a gun come out of the driver's side window of defendant's car. Bowman and Whitehead drove away.

On June 19, 2003, Whitehead went to the Eureka Police Department to tell them what he knew about the shooting. The police also interviewed Bowman that night. Bowman initially said he did not know who was driving defendant's car. In a second interview, Bowman admitted he had seen defendant driving the car and shooting the gun.

    4. Other Witnesses

Defendant's friend, Chris Brooks, returned home from Eureka High School about 1:00 p.m. on June 17, 2003. Defendant was there. Defendant told Brooks he had shot someone, but Brooks assumed he was joking.

Shaunda Spears was home with her boyfriend at 1839 California Street on June 16, 2003. Shortly after 9:00 p.m. she heard a gunshot. Her boyfriend said, "[T]hat was a bullet that hit our house." Spears ran to her neighbor's house to use the telephone. Approximately five minutes later as she was leaving the neighbor's house, she heard more shots and saw people running and screaming. Later that night, police found two bullet holes in Spears's living room that had not been there prior to June 16, 2003. A deformed, silver-tip nominal .38-caliber bullet was found a few days later inside the wall near one of the holes.

Criminalist John Charles Boyd determined that the bullet found at 1839 California was fired from the same weapon as the bullet removed from Anderson's body. Boyd opined that the bullets found in defendant's car could have been fired from the same weapon as the bullets found in Spears's house and Anderson's body.

Eureka Police Officer John Turner testified as an expert in gang identification, culture, and behavior. He explained the historic rivalry between the Norteño and Sureño gangs. A person becomes a "validated" gang member according to law enforcement when they meet certain criteria points that range from wearing gang colors to committing gang crimes. Calderon was "validated" as a Norteño gang member on June 25, 2003; defendant was validated on July 22, 2002. Turner believed that defendant had been associated with, and claimed to be a member of, the Norteño gang since May 2000.

According to Turner, at the time of the shooting in this case, defendant's presence in a Sureño gang area showed his bravado

5

and willingness to fight. Shooting Anderson, a validated Sureño, would enhance defendant's status within the Norteño structure, would indicate the Norteño gang's willingness "to do battle," and would show the ultimate disrespect to the rival gang. Within the gang culture, the fact that a person is a member of a rival gang is a sufficient reason to kill that person.

### 5. Assault on Ashley Richards (Count Five)

Eighteen-year-old Ashley Richards lived at 1829 California, at Del Norte. Richards's ex-boyfriend Joseph Notman, and her current boyfriend Craig, were visiting about 9:00 p.m. on June 16, 2003. The two men stood on the front porch. Richards was in her room, and heard five or six gunshots. She went outside and walked to the corner.

Richards returned to her room. She then heard Notman call to her, "Hey, come check this out." She stuck her head out the door and saw a car on California. In the car, she saw an arm sticking out of the driver's side window holding a gun. Richards heard about 10 more shots. A bullet hit her, knocking her backward against the house.

Eureka Police Detective Robert George Metaxas arrived at the hospital at 10:00 p.m. and spoke to Richards. She told Metaxas that she first heard six shots. She saw a white Cadillac on California with an arm sticking out of the driver's side apparently holding a gun. She said the Cadillac belonged to someone named Maher or Maurer who worked at Sears in the Bayshore Mall. She then heard two or three more shots and was struck in the face. FN2

> FN2. At trial, Richards did not remember speaking to Metaxas before her surgery, or telling him that the car belonged to Maher. She testified that she did not know who owned the car.

### 6. Prior Incident Admitted to Show Motive

Over defendant's objection, Jessica Temple testified as follows: In early May 2003, a couple of weeks before Mother's Day, a confrontation between members of the Norteño and Sureño gangs occurred in front of Phil Jones's house, a place where Norteños sometimes gathered. Temple, age 20 when she testified, had driven Anderson, "Bear," and Ruby to Jones's house. David Gensaw planned to fight Oliveras and Temple planned to fight defendant. Temple was "pretty sure" that Anderson also intended to fight defendant. The location of the planned fight changed several times, finally settling on Highland Park.

> Temple went to Highland Park, but the rival gang members did not appear. She then drove around and saw 10 or more Norteño affiliates, including defendant, at Jones's house. Friends of Temple, including Gensaw, Jennifer, and Jessica, were in another car following Temple's. Temple and Anderson got out of Temple's car and Gensaw yelled at them to get back in. Temple and Anderson refused, and continued to walk toward the Norteños, empty-handed. Four Norteños approached Gensaw's car with bats and sticks. Bear, who was sitting in Temple's car, pulled out a gun and pointed it toward the Norteños. The Norteños ran back, diving for cover.
>
> Defendant was standing by his car and remained there. He reached into his car and retrieved a .38-caliber revolver from beneath his dashboard, pointing it toward Temple and Anderson. They were about 20 feet from defendant when he began to shoot. Temple and Anderson ran back to Temple's car and got inside. Approximately four bullets hit Temple's car, putting holes into the front windshield, the dashboard, and the driver's door, and shattering the driver's window. Defendant continued to shoot as Temple drove away. Temple did not report the shooting to the police because it was gang-related.
>
> B. Defense Case
>
> Dr. John Thornton testified on ballistics and bullet trajectories. He examined the bullet holes at 1839 California and opined they were not consistent with someone standing at the intersection of California and Del Norte or shooting from a vehicle on California. Dr. Thornton was not able to offer an opinion regarding the trajectory of the bullet that struck Ashley Richards.

(Resp. Ex. E at 2-8.)

## LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  The first prong applies both to questions of law and to mixed questions of law and fact, <u>id.</u> at 407-09, and the second prong applies to decisions based on factual determinations, <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  <u>Id.</u> at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  <u>Id.</u> at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  <u>Miller-El</u>, 537 U.S. at 340.  A petitioner must present clear and convincing

8

evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims.

## DISCUSSION

Petitioner raises two related claims in his federal habeas petition. First, he alleges the trial court violated his right to due process when it admitted evidence of uncharged conduct. (Petition at 28-38.)[1] Second, Petitioner asserts that, to the extent the Court concludes that Petitioner waived the due process

---

[1] Petitioner attaches copies of what appear to be sections from his state habeas petitions. Therefore, the page numbering is not in numerical order. For ease of reference, the Court uses the page numbers as printed on Petitioner's petition pages.

argument at trial, counsel was ineffective for failing to preserve the issue adequately. (Petition at 39-43.)

I.   Evidence of uncharged conduct

Pursuant to a motion in limine, the trial court heard testimony regarding a prior shooting incident involving Petitioner and the victim, which the prosecutor wished to offer into evidence for the purposes of proving "identity, motive, and intent." (RT 839-849.) The trial court summed up the proffered evidence as showing that, within a month prior to the underlying crimes, Petitioner and the victim were scheduled to fight but Petitioner failed to show up; witness Jessica Temple and the victim drove to a Norteño hangout hoping to find Petitioner; Temple and the victim got out of the car when they got to the hangout; Petitioner reached into his car and began firing shots at them; and Petitioner shot at Temple and the victim's car as they fled. (RT 846.) The trial court then ruled that the evidence was admissible under California Evidence § 1101 because it was relevant to show motive. (Id.) After hearing testimony from Temple, the court ruled that, although the evidence regarding gangs was potentially prejudicial, the testimony was also highly relevant as to the issue of motive, and concluded that, in balancing the probative value against the prejudicial effects, the evidence was admissible under California Evidence § 352. (RT 900-901.)

The California Court of Appeal analyzed the issue and concluded that the trial court did not abuse its discretion in admitting the evidence.

> The trial court's decision to admit evidence of the May 2003 incident was not arbitrary, capricious, or absurd. If credited

10

by the jury, the evidence showed that defendant had a special motive to violently attack Anderson in June 2003, because Anderson had threatened and shown disrespect to him a few weeks earlier. According to Temple, the May 2003 fight she arranged with defendant was not just a clash between Norteños and Sureños generally, but included specifically a plan for Anderson to fight defendant. On the date of the planned fight, Temple, Anderson, and the others in the Sureño-affiliated group went looking for defendant in an area that was known to be a Norteño hangout. Ignoring their own friends' pleas, Temple and Anderson stepped out of their car and advanced toward defendant. By Temple's account, no other members of her Sureño group acted as aggressively that day as she and Anderson did. Their combative approach toward defendant elicited a powerful reaction from him--causing him to shoot at them, and continue shooting as they fled.

The jury could reasonably infer from this evidence that defendant held a special animus toward Anderson. That inference arises not only from the facts elicited from Temple, but from the combined effect of her testimony and that of the prosecution's gang expert. Detective Turner explained the strong feelings gang members have when their turf is invaded or they are "disrespected" by a rival gang member. Not only had Anderson advanced on defendant to fight him, but he had "disrespected" defendant and the Norteños by doing it in Norteño home territory, in front of other gang members. The facts regarding the prior incident were therefore highly relevant to prove a potential motive for defendant to kill Anderson. The trial court did not abuse its discretion in admitting the evidence for that purpose under section 1101, subdivision (b). (Footnote omitted.)

We also cannot say that the trial court abused its discretion in overruling defendant's objection under section 352. Temple's testimony did not consume undue time or inject confusing issues into the trial. The risk in admitting the testimony was that it would be taken by jurors as proof of a propensity by defendant to engage in the very type of conduct with which he was charged--shooting at Sureño gang members. We do not believe this risk outweighed the probative value of the evidence.

First, although the two shooting incidents were similar, they were not identical. Unlike the charged incident, defendant was not the initial aggressor in the May incident. In Temple's account, defendant started shooting in the May incident only after his turf had been suddenly invaded, hostile rival gang members were advancing toward him, and a member of Temple's group had threatened his group with a gun. In the charged incident, defendant was accused of hunting for Sureños to attack, and of firing the fatal shot on a second or third pass through their neighborhood, having already fired six shots at a crowd of Sureños and reloaded his weapon. The

11

conduct on defendant's part alleged in connection with the charged crime is thus significantly more premeditated and bellicose than that to which Temple testified.  His participation in the May incident would not constitute strong propensity evidence of his guilt for the much more aggravated crime committed in June.

Second, before Temple testified, the trial court specifically admonished the jury that the evidence "may not be considered to prove . . . that the defendant is a person of bad character or that he has a disposition to commit crimes" or for any purpose other than whether it tended to show a motive for the commission of the charged crime.  This admonition mitigated any risk that the jury would draw improper inferences from Temple's testimony.

Finally, motive evidence is unquestionably relevant to prove defendant's identity as the shooter and his intent to kill the victim. (Citation omitted.) Testimony that the defendant and the victim were involved in a conflict that erupted in a gunfire one month before the charged crime is highly probative on the issue of motive.  All things considered, the trial court acted within its discretion in determining that the probative value of such testimony was not substantially outweighed by the risk of undue prejudice to the defendant. (Citation omitted.)

Even assuming for the sake of analysis that the trial court erred in admitting the Temple testimony, we would not find the error to be prejudicial.  Overwhelming percipient witness testimony and physical evidence tied defendant to the crime. Calderon, Bowman, and Whitehead knew defendant well and were present with him at the time and place of the crime on June 16, 2003.  All three identified him as the sole shooter. Another witness present, Hillary Fontaine, recognized defendant and had seen him drive by the area of the shooting several times, starting on the day before the shooting, in the same tan or off-white Cadillac.  She saw him shooting the first volley of shots and, from her hiding place, saw Anderson fall when he was hit during the second and final round of shooting.  Witness Chris Brooks, a close friend of defendant, testified that defendant told him on June 17 that he had shot someone.

Calderon's testimony was particularly damaging.  He was a passenger in defendant's car.  He watched defendant empty spent cartridges from his gun and reload it moments before firing the final volley of shots that killed Anderson and struck Ashley Richards.  After the shooting, he and defendant discussed the need to get rid of his car and gun, and he was with defendant when they abandoned the car near Oliveras's house.  A white Cadillac matching descriptions of the shooter's car was found near Oliveras's house.  It was registered to defendant, and contained documents with

12

>     defendant's name on them.  The bullet that killed Anderson and
>     the one that lodged in the wall of Shaunda Spears's house on
>     June 16, 2003, were fired from the same gun, and the unused
>     bullets found hidden in defendant's car were also capable of
>     being fired from that gun.
>
>     Notwithstanding the extent of the evidence against him,
>     defendant argues that prejudice must be inferred from the
>     following comment made by the prosecutor in closing argument:
>     "Jessica [Temple] tells you the defendant shot at her before
>     with what she thinks was a .38 revolver.  It's the same
>     caliber that we're talking about here."  According to the
>     defendant, this comment was an attempt to use Temple's
>     testimony for the improper purpose of establishing identity
>     rather than motive.  But Temple's lay opinion about the
>     caliber of defendant's gun was inconsequential, especially in
>     comparison to the mountain of other credible eyewitness and
>     physical evidence identifying defendant as the shooter in the
>     charged crime.  Whether viewed under the standard of Chapman
>     v. California (1967) 386 U.S. 18 or People v. Watson (1956) 46
>     Cal. 2d 818, the admissible evidence was sufficiently
>     conclusive of defendant's guilt that any assumed error in the
>     admission of Temple's testimony, or improper comment on it by
>     the prosecution, were harmless.

(Resp. Ex. E at 11-14.)

The United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Absent such a ruling from the Supreme Court, a federal habeas court cannot find the state court's ruling was an "unreasonable application" of "clearly established federal law" under 28 U.S.C. § 2254(d)(1).  Id. (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)).  Under Holley, therefore, habeas relief cannot be granted on Petitioner's claim that the admission of overly-prejudicial evidence of his prior act violated his right to due process.  See id. at 1101 n.2 (finding that although trial court's admission of irrelevant and prejudicial evidence violated due process under Ninth Circuit precedent, such admission was not

13

contrary to, or an unreasonable application of, "clearly established Federal law" under section 2254(d)(1), and therefore not grounds for granting federal habeas relief).

Even if federal habeas relief were available on a claim that the admission of overly prejudicial evidence violates due process, the state courts reasonably found that the evidence of Petitioner's prior act caused no such violation in this case. It is constitutionally permissible to draw an inference of motive and identity from the evidence, and it is only if no permissible inferences can be drawn from the evidence that its admission violates due process. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

The similarity of Petitioner's prior attack against the victim and its proximity in time made the witnesses' accounts of the charged crimes more credible. The risk of prejudice from the evidence was mitigated both by the instructions limiting the jury to the evidence's permissible purposes, which the jury is presumed to follow, see Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997), and by the fact that the account of the prior act of violence was no more inflammatory than the charged crimes. Under these circumstances, even if habeas relief could be obtained based on a claim that the admission of evidence violated due process, the state courts were not unreasonable in finding that the evidence was not substantially more prejudicial than probative so as to cause a due process violation.

Moreover, even if admission of the uncharged conduct were erroneous, in order to obtain federal habeas relief on this claim,

14

1 Petitioner would have to show that the error was one of
2 constitutional dimension <u>and</u> that it was not harmless under <u>Brecht</u>
3 <u>v. Abrahamson</u>, 507 U.S. 619 (1993). He would have to show that the
4 error had "'a substantial and injurious effect' on the verdict.'"
5 <u>Dillard v. Roe</u>, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting
6 <u>Brecht</u>, 507 U.S. at 623). Based on the evidence as summarized in
7 the Court of Appeal's opinion, and especially the testimony of five
8 witnesses who knew Petitioner and identified him as the sole
9 shooter, Petitioner cannot demonstrate that any error had a
10 substantial or injurious effect on the verdict.

11 Accordingly, the California Court of Appeal's decision denying
12 relief on this claim was not contrary to or an unreasonable
13 application of clearly established federal law. <u>See</u> 28 U.S.C.
14 § 2254(d).

15 II. Ineffective Assistance of Counsel

16 Petitioner argues that, if the Court concludes that he waived
17 the claim that the prior acts evidence was irrelevant under section
18 1101, trial counsel provided ineffective assistance in failing to
19 object to the evidence as irrelevant under section 1101. To begin
20 with, trial counsel did object that the evidence should not have
21 been admitted under section 1101 and/or 352 and he was overruled.
22 The trial court specifically ruled that the evidence was more
23 probative than prejudicial under Section 352, and thus any
24 objection on those grounds would have been futile. <u>Cf. Juan H. v.</u>
25 <u>Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005) (failure to make
26 meritless motion cannot be ineffective assistance). Moreover,
27 because the California Court of Appeal did not find that Petitioner
28

15

waived the argument[2] but instead addressed the claim on the merits, Petitioner's claim that counsel was ineffective for failing to preserve the issue is meritless.

Accordingly, the California Court of Appeal's decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition). Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

---

[2] "We do not find that defendant waived his section 1101 arguments by failing to specifically renew them after the section 402 hearing in the trial court." (Resp. Ex. E at 12 n.6.)

16

The clerk shall enter judgment and close the file.  All pending motions are terminated.  Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: 3/28/2011

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

MAHER C SUAREZ,

        Plaintiff,

v.

TOMMY FELKER et al,

        Defendant.

Case Number: CV08-04937 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 28, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Maher Conrad Suarez V82078
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127

Dated: March 28, 2011

        Richard W. Wieking, Clerk
        By: Nikki Riley, Deputy Clerk

18